**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------×
PETER BRYAN TORRES,

               *Plaintiff,*                        **17 CV 2825**

     *v.*

THE AMERICAN MUSEUM OF NATURAL HISTORY    **COMPLAINT**
and JUAN MONTES, individually,

               *Defendants.*
------------------------------------------------------------------------×

       Plaintiff Peter Bryan Torres, by his counsel, The Harman Firm, LLP, alleges for his

Complaint against Defendants The American Museum of Natural History and Juan Montes,

individually, as follows:

## PRELIMINARY STATEMENT

       1.      Plaintiff Peter Bryan Torres ("Plaintiff" or "Mr. Torres") worked at The American

Museum of Natural History ("Corporate Defendant" or the "Museum") as the Administrative

Manager for Information Technology & Office of the Chief Information Officer.  Juan Montes

("Individual Defendant" or "Mr. Montes") (Individual and Corporate Defendants are hereinafter

referred to collectively as "Defendants") is the Museum's Chief Information Officer and Mr.

Torres's supervisor at the Museum.

       2.      Defendants subjected Mr. Torres to severe discrimination and harassment on the

basis of his disability (HIV and narcolepsy) and sexual orientation (gay).  After learning that Mr.

Torres is HIV-positive, Mr. Montes began a campaign of harassment and discrimination against

Mr. Torres.  Among other things, he refused to touch or come near Mr. Torres, took away Mr.

Torres's job responsibilities, screamed at Mr. Torres to "leave his medical shit at home," and

made numerous highly offensive and discriminatory comments about Mr. Torres's sexual

orientation and HIV status.

3.     Plaintiff seeks damages and costs against Defendants for interfering with and retaliating against him for his exercise of his rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq*.

4.     Plaintiff also seeks damages and costs against Defendants for discriminating against him on the basis of his disability by subjecting him to a hostile work environment and failing to provide him with a reasonable accommodation, in violation of the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq*.

5.     Plaintiff also seeks damages and costs against Defendants for subjecting him to a hostile work environment based on his sexual orientation, in violation of the NYCHRL.

6.     Plaintiff also seeks damages and costs against Defendants for retaliating against him for his complaints of disability and sexual orientation discrimination and for his request for a reasonable accommodation, in violation of the NYCHRL.

7.     Plaintiff also seeks damages and costs against Individual Defendant for intentional infliction of emotional distress, in violation of the New York State common law.

8.     Plaintiff also seeks damages and costs against Corporate Defendant for taking unlawful deductions from his paycheck, in violation of the New York State Labor Law ("NYLL"), N.Y. Lab. Law § 193.

## JURISDICTION AND VENUE

9.     Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over Plaintiff's claims arising under the FMLA.

10.     Pursuant to 28 U.S.C. § 1332, this Court has supplemental jurisdiction over Plaintiff's NYCHRL, NYLL, and common law claims, as those claims are so related to the federal claims that they form part of the same case or controversy.

11.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the Southern District of New York, as a substantial part of the events giving rise to these claims occurred within this District.

## TRIAL BY JURY

12.     Plaintiff respectfully requests a trial before a jury.

## PARTIES

13.     Plaintiff, at all times relevant hereto, was and is a resident of Hudson County in the State of New Jersey.

14.     Upon information and belief, at all times relevant hereto, Corporate Defendant was and is a not-for-profit corporation organized under the laws of the State of New York with its principal place of business located at Central Park West and 79th Street, New York, New York 10024.

15.     Upon information and belief, at all times relevant hereto, Individual Defendant was and is Corporate Defendant's Chief Information Officer and a resident of Bronx County in the State of New York.

## STATEMENT OF FACTS

16.     Mr. Torres is diagnosed with HIV and narcolepsy.

17.     Mr. Torres also suffers from a rare genetic mutation which causes his HIV symptoms to be particularly resistant to antiretroviral treatments.

18.     Mr. Torres began working at the Museum on or about May 5, 2007.

19.     Throughout his employment, Mr. Torres has been an outstanding, dedicated employee who has consistently fulfilled his job responsibilities, earning several promotions and raises over the course of his employment.

3

20.     Mr. Torres's current position at the Museum is Administrative Manager for Information Technology & Office of the Chief Information Officer.

21.     Mr. Torres, who is gay, has been out at work throughout his employment; all of his coworkers were aware of his sexual orientation.

22.     In and around 2012, Mr. Torres requested a medical accommodation to allow him to continue to perform the essential functions of his job—namely, that he be allowed to arrive at work late and leave early when his medical conditions necessitated.

23.     The Museum granted Mr. Torres's request.

24.     For the next several years, the accommodation functioned without issue: Mr. Torres's accommodation had no effect on the Museum's business or efficiency, and the Museum had no complaints about Mr. Torres's performance.

25.     In and around April 2015, the Museum hired Juan Montes as Chief Information Officer, and Mr. Montes became Mr. Torres's direct supervisor.

26.     On or about May 23, 2016, Mr. Torres collapsed in his home around 5:30 p.m. due to HIV-related medical issues and was rushed to the emergency room.

27.     Mr. Torres texted his colleagues, including Mr. Montes, around 7:00 p.m. to let them know that he was in the hospital.

28.     That same evening, around 10:30 p.m., Mr. Montes called Mr. Torres at the hospital under the pretext that he was concerned for Mr. Torres's health, asking Mr. Torres what was going on.

29.     Mr. Torres responded that he was still at the hospital, was scared, and was unsure what was happening, as he was still waiting to see test results.

30.     Mr. Montes responded only, "Okay…should I contact HR?"

31.     Mr. Torres replied that there was no need to contact HR, as HR was typically only notified about extended absences.

32.     Mr. Montes responded, "Oh, okay, no problem, I just wanted to make sure," and ended the conversation.

33.     Two days later, Mr. Torres returned to work.

34.     Upon Mr. Torres's return to work, he updated Mr. Montes on his health and, in doing so, disclosed his HIV status to Mr. Montes for the first time.

35.     Mr. Montes immediately confronted him aggressively, stating, "I should have been told what your medical issues are [referring to Mr. Torres's HIV status and narcolepsy]. I can't have your medical issues interfering with my vision for the Museum."

36.     Mr. Montes then told Mr. Torres that he was a "danger" to Mr. Montes and Mr. Montes's children because Mr. Torres is HIV-positive.

37.     Mr. Montes informed Mr. Torres that he had gone to HR the previous day and demanded that HR disclose to him Mr. Torres's full medical history, which HR refused to do.

38.     Mr. Montes then told Mr. Torres that Mr. Montes "should have been given full disclosure of [Mr. Torres's] medical history upon being offered the position as Chief Information Officer" so that he could "decide whether [he] wanted to work with someone like [Mr. Torres]."

39.     Mr. Torres told Mr. Montes that he was taking care of his health, that his medical conditions had never interfered with his work performance, and that he was certainly no "danger" to Mr. Montes or his children.

40.     Mr. Montes again responded with vitriol and hostility, telling Mr. Torres, "I don't know that. I don't know anything about it!"

41.     In an attempt to show Mr. Montes that he was proactive about managing his HIV treatment, Mr. Torres took out his cellphone to show Mr. Montes a cellphone application, MyChart, that Mr. Torres uses to keep track of his HIV treatment plan, monitor lab test results, and communicate with his doctors.

42.     Mr. Montes grabbed Mr. Torres's cellphone out of Mr. Torres's hand and perused Mr. Torres's confidential and private medical history without authorization.

43.     Later that day, Mr. Torres learned that Mr. Montes had told the Museum that Mr. Torres was "missing" and that "no one knew where he was" the day after Mr. Torres's hospitalization; Tarek Ahmed, an employee in Mr. Torres's department, asked Mr. Torres, "[Mr. Montes] said you were missing, what happened?"

44.     Mr. Torres, surprised, responded, "I wasn't missing, I was in the hospital. When did he tell you that?"

45.     Mr. Ahmed told Mr. Torres that Mr. Montes had made the comment the previous day—after Mr. Montes had personally spoken to Mr. Torres while Mr. Torres was in the hospital.

46.     Mr. Torres formally complained to HR about the incident with Mr. Montes, specifically citing disability discrimination.

47.     Mr. Torres spoke to Kala Harinarayanan, the Museum's Director of Environmental Health and Safety, who said that the Museum would "investigate."

48.     The Museum, however, did not begin to investigate Mr. Torres's allegations until March 10, 2017—nearly one year after Mr. Torres's complaint.

49.     After learning of Mr. Torres's HIV status, Mr. Montes began a campaign of harassment and discrimination against Mr. Torres and has done everything in his power to pressure Mr. Torres into leaving his position at the Museum.

50.     Shortly after learning that Mr. Torres has HIV, Mr. Montes began to take away Mr. Torres's job responsibilities, reassigning Mr. Torres's tasks to less experienced employees.

51.     Mr. Montes humiliated, ostracized, and harassed Mr. Torres on a daily basis.

52.     Mr. Montes screamed at Mr. Torres to "leave his medical shit at home and out of the office" in reference to Mr. Torres's informing him that he is HIV-positive.

53.     After learning of Mr. Torres's HIV status, Mr. Montes refused to speak with Mr. Torres unless absolutely necessary or to reprimand and harass him.

54.     While Mr. Montes would make polite conversation with other employees and regularly gave other employees feedback and guidance, he now refused to meet with Mr. Torres or even say good morning to him.

55.     If Mr. Montes needed to give instructions or assignments to Mr. Torres, he would go out of his way to avoid speaking to Mr. Torres personally, instead using another employee, such as Mr. Benedetto, to communicate with Mr. Torres.

56.     Mr. Montes required Mr. Torres to notify everyone in the department when Mr. Torres needed to miss work due to his medical condition, yet did not require any other employees to do so.

57.     Mr. Montes interfered with Mr. Torres's existing medical accommodation by creating burdensome, irregular procedures for Mr. Torres's use of his accommodation.

58.    Upon information and belief, Mr. Montes pressured Museum HR into requiring Mr. Torres to submit excessive medical documentation in an effort to set Mr. Torres up so that Mr. Torres's accommodation request would be denied and he could be terminated.

59.    Upon receiving the documents, HR (upon information and belief, at Mr. Montes's directive) then required Mr. Torres and his doctors to make extensive changes and edits to the submitted medical documentation before the Museum would accept it.

60.    The Museum required Mr. Torres to submit such changes up to four times per month.

61.    Even then, Mr. Montes refused to allow Mr. Torres to use his accommodation as agreed; Mr. Montes told Mr. Torres that he could not come in late or leave early because Mr. Torres was "out of sick time," even though Mr. Torres's accommodation consisted of being allowed to come in late or leave early when necessary.

62.    At the same time, Mr. Montes allowed other employees to come in late or take time off work for non-medical reasons.

63.    For example, he allowed Mike Benedetto, the Museum's Director of Information Technology and Deputy Chief Information Officer, to routinely come in late and to take time off for Boy Scout events.

64.    On days that Mr. Torres had a scheduled doctor's appointment or needed to leave work early for medical reasons, Mr. Montes refused to allow him to take a lunch break or even eat at his desk, telling him that he was not allowed to eat lunch—even though Mr. Montes knew that such a restriction could endanger Mr. Torres's health.

65.    No other employees in Mr. Torres's department were ever subjected to such a policy.

66.     When Mr. Torres needed to arrive late to work for medical reasons, Mr. Montes deducted the time from his wages.

67.     Again, to Mr. Torres's knowledge, no other employee in the department ever had their pay docked for leaving early for appointments.

68.     In addition, all employees in Mr. Torres's department were allowed to work from home.

69.     Mr. Torres's working from home had never previously been a problem, yet Mr. Montes suddenly revoked only Mr. Torres's ability to do so, taking away a right that every other employee enjoyed.

70.     Mr. Montes intentionally attempted to sabotage Mr. Torres's work and set him up for termination by giving him unrealistic deadlines and impossible assignments.

71.     For example, Mr. Montes claimed that Mr. Torres had mistakenly made travel arrangements and sent him to Syracuse for a meeting that was actually being held in Rochester.

72.     Mr. Torres was shocked that he had made such a mistake.  Afraid that he would be terminated, he apologized profusely to Mr. Montes and directly contacted the travel agency to find out more details about what had happened.

73.     Upon contacting the travel agency, however, the travel agent forwarded Mr. Torres emails from Mr. Montes to the travel agency, in which Mr. Montes had requested that the agency arrange for Mr. Montes to travel to Syracuse.

74.     In reality, Mr. Torres had made previous arrangements with the agency for Mr. Montes to travel to Rochester, and Mr. Montes had never traveled to Syracuse at all.  The entire trip was a complete fabrication, intended to create an excuse for Mr. Montes to give Mr. Torres negative performance feedback.

75.     Mr. Montes conspicuously avoided physical contact with Mr. Torres because of his HIV status.

76.     Mr. Montes refused to touch or come near Mr. Torres, keeping his back to the wall and creating as much space as possible when speaking to Mr. Torres.

77.     This highly offensive, discriminatory conduct was so obvious that Mr. Torres's coworkers noticed and made comments to Mr. Torres about Mr. Montes's behavior.

78.     Sally Holt, an employee in Mr. Torres's department, witnessed Mr. Montes clinging to the wall in an exaggerated manner while speaking to Mr. Torres, as he had begun to do regularly while speaking to Mr. Torres.

79.     Ms. Holt asked, "What the hell was that?" in reference to Mr. Montes's behavior.

80.     Mr. Torres responded, "He does that whenever he sees me."

81.     Mr. Torres's coworkers began to avoid Mr. Torres, as well, due to Mr. Montes's overt discrimination.

82.     Mr. Montes would frown, visibly displeased, if anyone attempted to make polite conversation with Mr. Torres.

83.     Gradually, Mr. Torres's coworkers began to speak to Mr. Torres in a whisper and cut short any friendly conversations with him, intimidated by Mr. Montes's behavior and open dislike of Mr. Torres.

84.     When Mr. Torres sprayed Lysol in his workspace, Mr. Montes profusely thanked him in a sarcastic manner, implying that the air around Mr. Torres was contaminated because Mr. Torres has HIV.

85.     Mr. Montes told Mr. Torres that Mr. Montes's brother was gay and that his family had disowned him because of it.

86.     Mr. Torres later told Mr. Montes that he found it difficult to speak honestly with Mr. Montes about his disabilities or his sexual orientation, based on Mr. Montes's previous comments about Mr. Montes's brother and about HIV.  Specifically, Mr. Torres raised concerns about Mr. Montes's potentially believing offensive, negative stereotypes about gay men who have HIV, namely that they somehow "deserve" or are at "fault" for being HIV-positive.

87.     Mr. Montes refused to address Mr. Torres's concerns about discrimination and, in fact, confirmed Mr. Torres's fears, telling Mr. Torres, "You're right.  That is how it's perceived."

88.     On another occasion, Mr. Montes discouraged Mr. Torres's heterosexual coworkers from attempting to include Mr. Torres in a workplace conversation about celebrity crushes; when Mr. Benedetto mentioned a male athlete, Mr. Montes quickly cut him off, saying, "Hey, Mike, uh-uh," and shaking his head disapprovingly.

89.     Before this, Mr. Torres's straight coworkers had always made efforts to include Mr. Torres in such conversations, and Mr. Torres had always been able to discuss his sexual orientation and relationships openly with his colleagues.

90.     On June 12, 2016, Mr. Torres's cousin was killed in the mass shooting at the Pulse nightclub in Orlando, Florida.

91.     Mr. Montes regularly used the department's expense budget to purchase flowers for other employees, but refused to do so for Mr. Torres.

92.     Instead, Mr. Torres's coworkers had to go around the office, collecting money for the flowers.

93.     In July 2016, Mr. Montes—who had previously given Mr. Torres only stellar performance reviews—gave him the lowest possible score, citing only "subpar performance."

94.    Mr. Torres repeatedly asked Mr. Montes to elaborate on this "subpar performance," yet Mr. Montes refused to do so, telling Mr. Torres that he would "forgive it."

95.    Eventually, after Mr. Torres insisted, Mr. Montes cited as the basis for the low score three times that Mr. Torres had arrived late to work.

96.    However, each incident was covered by Mr. Torres's medical accommodation, which had been agreed upon with the Museum in 2012 and had functioned without issue for over four years.

97.    Mr. Torres explained that the time off had been covered by his existing accommodation, sick leave, and FMLA leave, voicing his concerns that Mr. Montes's negative review was pretext for disability discrimination.

98.    Mr. Montes responded only, "But if it were not FMLA days, I could terminate you, right?"

99.    Mr. Torres, confused by Mr. Montes's bizarre response, asked what he meant.

100.    Mr. Montes said, "If I didn't know about your medical condition, then I could terminate you, right?"

101.    Mr. Torres complained to HR and to Mr. Montes, yet nothing was done, and the discrimination and harassment continued unabated.

102.    Mr. Torres began to experience severe anxiety and depression related to the ongoing discrimination, including suicidal ideation related to fears of losing his job and health insurance coverage, difficulty sleeping, headaches, a variety of gastrointestinal symptoms including nausea and vomiting blood, loss of appetite, and feelings of shame, hopelessness, and pessimism.

103.    In August 2016, Mr. Torres had a seizure as a result of the discriminated-related stress.

104.    The seizure caused Mr. Torres to fall and tear multiple ligaments in his knee.

105.    The injury was so severe that it necessitated reconstructive surgery, which is still pending.

106.    Mr. Torres needed to take time off work due to his injury.

107.    When Mr. Torres returned to work in December 2016, he was still recovering from the injury and relied on a cane to walk.

108.    Upon seeing this, Mr. Montes openly mocked Mr. Torres, commenting, "Oh my God, now he even has a cane?!"

109.    After the Museum failed to respond to Mr. Torres's complaints, Mr. Torres retained counsel.

110.    A litigation hold letter was sent to the Museum on or about March 9, 2017.

111.    Only thereafter did the Museum commence the "investigation" that it had said would begin in May 2016, nearly a year earlier.

112.    The investigation involved a six-hour interview of Mr. Torres.

113.    The only result of the Museum's investigation was an email to Mr. Torres from the Museum's HR, telling Mr. Torres that if he did not immediately return to work, the Museum would stop paying him.

114.    Far from disciplining Mr. Montes or taking any action to address Mr. Torres's complaints, the Museum's response utterly failed to address the ongoing discrimination harassment in any way whatsoever, yet it simultaneously demanded that he return to the abusive

and unabated hostile work environment.  As such, Mr. Torres has been constructively terminated from his position at the Museum.

115.    Mr. Montes and the Museum have made Mr. Torres's working conditions so difficult and unpleasant that a reasonable person in his shoes would have felt compelled to resign.

## CAUSES OF ACTION
### FIRST CAUSE OF ACTION
### Interference in Violation of the FMLA
### (Against All Defendants)

116.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 115 with the same force as though separately alleged herein.

117.    The FMLA prohibits an employer from interfering with, restraining, or denying the exercise of (or attempts to exercise) any rights provided by the FMLA.

118.    Defendants interfered with Plaintiff's exercise of his rights under the FMLA by refusing to allow him to use leave to which he was entitled under the FMLA.

119.    As such, Defendants have violated the FMLA.

120.    As a direct and proximate consequence of Defendants' FMLA interference, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

### SECOND CAUSE OF ACTION
### Retaliation in Violation of the FMLA
### (Against All Defendants)

121.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 120 with the same force as though separately alleged herein.

122.    The FMLA prohibits an employer from retaliating against an employee for having exercised or attempted to exercise any FMLA right.

123.    Defendants retaliated against Plaintiff for his exercise of, and his attempts to exercise, his rights under the FMLA by subjecting him to discrimination and harassment and prohibiting him from taking further advantage of his FMLA rights.

124.    As such, Defendants have violated the FMLA.

125.    As a direct and proximate consequence of Defendants' retaliation, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

### THIRD CAUSE OF ACTION
### Disability Discrimination in Violation of the NYCHRL
### (Against All Defendants)

126.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 125 with the same force as though separately alleged herein.

127.    The NYCHRL prohibits an employer from discriminating against an employee because of that employee's actual or perceived disability.

128.    Defendants discriminated against Plaintiff based on his disability by subjecting him to a hostile work environment, including making discriminatory and harassing comments and treating him less well than other employees.

129.    As such, Defendants have violated the NYCHRL.

130.    As a direct and proximate consequence of Defendants' disability discrimination, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

### FOURTH CAUSE OF ACTION
### Sexual Orientation Discrimination in Violation of the NYCHRL
### (Against All Defendants)

131.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 130 with the same force as though separately alleged herein.

132.    The NYCHRL prohibits an employer from discriminating against an employee because of that employee's actual or perceived sexual orientation.

133.    Defendants discriminated against Plaintiff based on his sexual orientation by subjecting him to a hostile work environment, including making discriminatory and harassing comments and treating him less well than other employees.

134.    As such, Defendants have violated the NYCHRL.

135.    As a direct and proximate consequence of Defendants' sexual orientation discrimination, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

**FIFTH CAUSE OF ACTION**
**Failure to Provide a Reasonable Accommodation in Violation of the NYCHRL**
**(Against All Defendants)**

136.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 135 with the same force as though separately alleged herein.

137.    The NYCHRL requires an employer to engage in a mandatory interactive process to identify a reasonable accommodation for an employee with a disability.

138.    Defendants failed to provide a reasonable accommodation for Plaintiff's disability by interfering with his use of his existing accommodation and refusing to engage in the mandatory interactive process to identify any other accommodation.

139.    As such, Defendants have violated the NYCHRL.

140.    As a direct and proximate consequence of Defendants' failure to provide a reasonable accommodation for his disability, Plaintiff has suffered, and continues to suffer,

substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

### SIXTH CAUSE OF ACTION
### Retaliation in Violation of the NYCHRL
### (Against All Defendants)

141.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 140 with the same force as though separately alleged herein.

142.    The NYCHRL prohibits an employer from retaliating against an employee for engaged in protected activity under the NYCHRL.

143.    Plaintiff engaged in protected activity under the NYCHRL when he requested a reasonable accommodation and when he properly complained to Defendants of disability and sexual orientation discrimination.

144.    Defendants retaliated against Plaintiff by, among other things, subjecting him to further discrimination and harassment, interfering with his use of a reasonable accommodation, and refusing to correct the discriminatory behavior.

145.    As such, Defendants violated the NYCHRL.

146.    As a direct and proximate consequence of Defendants' retaliation, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

### SEVENTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress
### in Violation of the New York State Common Law
### (Against Individual Defendant)

147.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 146 with the same force as though separately alleged herein.

148.    Individual Defendant subjected Plaintiff to extreme and outrageous conduct, including near-constant abuse and harassment concerning Plaintiff's disability and sexual orientation.

149.    Individual Defendant intended his actions to cause, or disregarded a substantial probability that his actions would cause, severe emotional distress to Plaintiff.

150.    As a direct result of Individual Defendant's conduct, Plaintiff has suffered severe emotional distress leading to significant medical and psychological consequences, including a seizure and persistent suicidal ideation.

### EIGHTH CAUSE OF ACTION
### Unlawful Wage Deductions in Violation of NYLL § 193
### (Against Corporate Defendant)

151.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 150 with the same force as though separately alleged herein.

152.    NYLL § 193 prohibits an employer from making any deduction from the wages of an employee unless permitted by law or by the employee.

153.    Corporate Defendant deducted Plaintiff's wages for needing to arrive late to work for medical reasons, without Plaintiff's consent.

154.    As such, Corporate Defendant has violated the NYLL.

155.    As a direct and proximate consequence of Corporate Defendant's NYLL violations, Plaintiff has suffered, and continues to suffer, substantial damages, all in amounts to be determined at trial.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests the following relief:

A.  For the first cause of action, damages to be determined at trial;

B.  For the second cause of action, damages to be determined at trial;

C.  For the third cause of action, damages to be determined at trial;

D.  For the fourth cause of action, damages to be determined at trial;

E.  For the fifth cause of action, damages to be determined at trial;

F.  For the sixth cause of action, damages to be determined at trial;

G.  For the seventh cause of action, damages to be determined at trial; and

H.  For the eighth cause of action, damages to be determined at trial;

I.  For such other and further relief as the Court deems just and proper.

Dated:      New York, New York
            April 19, 2017

By:  _____

Walker G. Harman, Jr. [WH-8044]
Edgar M. Rivera [ER-1378]
THE HARMAN FIRM, LLP
220 Fifth Avenue, Suite 900
New York, NY 10001
(212) 425-2600
wharman@theharmanfirm.com
erivera@theharmanfirm.com

*Attorneys for Plaintiff*